United States District Court
District of Connecticut
FILED AT NEW HAVEN

October 22, 20 22

By   S. Santos
        Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE TRACKING OF AN ENCLOSED TRAILER, COLOR BLACK AND CHROME, WITH UNKNOWN REGISTRATION, CURRENTLY PARKED AT 65 SAGINAW TRAIL, SHELTON, CONNECTICUT | Case No. 3:22-mj-00943 (MEG)<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A TRACKING WARRANT**

I, David Schaefer, a Task Force Officer with the Drug Enforcement Administration, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the installation and monitoring of a tracking device in or on a black and chrome enclosed trailer with unknown registration and vehicle identification number (the "**TARGET VEHICLE**"). Based on the facts set forth in this affidavit, I believe that the **TARGET VEHICLE** is presently being used in furtherance of violations of 21 U.S.C. §§ 841(a)(1) and 846 and that there is probable cause to believe that the installation and use of a tracking device in or on the **TARGET VEHICLE** will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

2. I am a member of the West Haven Connecticut Department of Police Services in the capacity of a sworn Police Officer and have been employed as a certified Police Officer in the State of Connecticut since 2010. I am assigned to the West Haven Police Department Street Crime Unit and am currently assigned as a Task Force Officer for the Drug Enforcement Administration (DEA), New Haven District Office (NHDO)-Tactical Diversion Squad (TDS). My duties include

1

investigating violations of the Connecticut General Statutes and the Controlled Substances Act, including but not limited to the diversion of controlled substances from legitimate medical channels. As a law enforcement officer, I have conducted numerous investigations of violations of the law, which have led to arrests and convictions. I have coordinated controlled purchases of illegal drugs using confidential sources and cooperating witnesses. I have participated in the execution of state and federal search warrants pertaining to individuals involved in the distribution of controlled substances; conducted electronic surveillance and physical surveillance of individuals involved in the distribution of controlled substances; analyzed records documenting the purchase and sale of illegal drugs; and spoken with informants and subjects, as well as other local, state, and federal law enforcement officers, regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport, and distribute illegal drugs. The following facts and circumstances are based on my personal knowledge, observation, and investigation, as well as information received from other police officers, Task Force Officers, and Special Agents involved in this investigation.

3. I am familiar with the information discussed herein. Where the contents of documents, or communications with others, are reported herein, they are set forth in substance and part, unless otherwise indicated.

4. The statements contained in this affidavit are based, in part, on information known to me as a result of my participation in this investigation, as well as on information that I have determined to be accurate and reliable obtained through: (a) physical surveillance, (b) other law enforcement officers and their reports, (c) confidential source information, and (d) my experience and training. Since this affidavit is being submitted for the limited purpose of the aforementioned authorizations, I have not included each and every fact known to me concerning this investigation.

I have set forth only the facts that I believe are essential to establish the foundation necessary to support the issuance of the requested court order.

5. I submit that probable cause exists to believe that the receipt of the requested information will constitute or lead to evidence of offenses involving conspiracy to possess with the intent to distribute narcotics, and possession of narcotics with the intent to distribute, in violation of Title 21, United States Code, Sections 841 (unlawful distribution of, and possession with intent to distribute, narcotics), and 846 (conspiracy to distribute, and to possess with the intent to distribute, narcotics) (the "TARGET OFFENSES"), as well as the identification of individuals who are engaged in the commission of these offenses. For the reasons set out in this affidavit, there is probable cause to believe that Willis TAYLOR, who is believed to be utilizing the **TARGET VEHICLE**, has committed and is continuing to commit the TARGET OFFENSES, along with other individuals who have yet to be identified. There is also probable cause to believe that the location information of the **TARGET VEHICLE** will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

## DESCRIPTION OF TARGET VEHICLE AND INVESTIGATION TARGET

6. The **TARGET VEHICLE** is a black, enclosed tow-behind trailer with chrome accents and two axles. The **TARGET VEHICLE** does not bear a visible registration, however, is believed to be utilized by Willis TAYLOR (DOB known to me of XX/XX/1956), who is a resident of 67 Edward Street, West Haven, Connecticut. During this investigation, investigators have seen the **TARGET VEHICLE** parked at 65 Saginaw Trail, Shelton, CT (where the TARGET VEHICLE is currently parked) and previously at 26 Kendall Street, New Haven, CT, throughout the day and during the overnight hours. Investigators also know that Willis TAYLOR, who resides

3

at 67 Edward Street, West Haven, Connecticut, uses the **TARGET VEHICLE**. It is unknown if the **TARGET VEHICLE** has a lienholder.

## PROBABLE CAUSE

### I.  Background on the Investigation and the DTO

7.  Members of the Drug Enforcement Administration (DEA) New Haven District Office (NHDO) Tactical Diversion Squad (TDS) are currently investigating Willis TAYLOR, a male currently residing in West Haven, Connecticut. TAYLOR has prior arrests dating back to 1973 and his most recent arrest was in 1988. TAYLOR is a convicted felon, with prior offenses including but not limited to larceny, threatening, possession of narcotics, issuing bad checks, assault, criminal mischief, burglary, possession of burglar tools, criminal attempt 1st degree, illegal discharge of firearm, carrying pistol without a permit, theft of a firearm, and reckless endangerment 1st degree.

8.  NHDO TDS has been investigating TAYLOR's manufacturing and distribution of wholesale quantities of counterfeit oxycodone 30mg tablets in and around New Haven, Connecticut. Investigators have identified TAYLOR as a member of a drug trafficking organization (DTO). In the summer of 2021, law enforcement learned from a cooperating witness ("CW-1") that TAYLOR had purchased pill presses and related equipment from CW-1 in the past.[1] Through surveillance and other investigative techniques as described herein, investigators

---

[1] CW-1 has been cooperating with the DEA since approximately June 2021 pursuant to a cooperation agreement between CW-1 and the U.S. Attorney's Office for the District of Connecticut. CW-1 has federal convictions for distribution and possession of equipment designed to manufacture controlled substances, importation of equipment for manufacturing controlled substances, and bribery of a public official. CW-1 has provided information and participated in investigations that have resulted in multiple federal and state arrests for quantities of narcotics, the illegal possession of firearms, and the possession of pill manufacturing equipment. Much of the information provided to controlling agents by CW-1 regarding the TAYLOR DTO has been corroborated through surveillance operations, drug seizures, and intercepted Title III communications. Accordingly, CW-1 is believed to be truthful, accurate, and reliable.

4

developed evidence that TAYLOR, with the assistance of other identified and unidentified individuals, was using a pill press machine to manufacture counterfeit oxycodone pills and was then distributing those counterfeit pills and other drugs to individuals throughout the greater New Haven County area.

9. Through intensive surveillance and other investigative techniques, investigators learned that TAYLOR uses a cellular device assigned to the telephone number 203-530-0242 ("Target Telephone 1"), subscribed to Willis TAYLOR, to conduct much of his narcotics trafficking activity. During the investigation, law enforcement applied for, and received, authorization to intercept wire and electronic communications over Target Telephone 1, among other telephones connected to the DTO. As relevant to this affidavit, on June 15, 2022, August 2, 2022, and October 5, 2022, U.S. District Judge Kari A. Dooley authorized the interception of wire and electronic communications over Target Telephone 1. Pursuant to those orders, interception of communications occurring over Target Telephone 1 has occurred from approximately June 16, 2022, to July 15, 2022; from August 3, 2022, to August 31, 2022; and from October 6, 2022, to present, with interceptions expected to end on or about November 5, 2022.

10. Through those intercepts, in conjunction with physical surveillance, pole camera footage, GPS location information from the Target Telephones, and other investigative techniques, law enforcement learned that TAYLOR initially was using a warehouse located at 26 Kendall Street, New Haven, CT, to store his pill press and manufacture counterfeit pills containing suspected narcotics. Investigators previously had observed the **TARGET VEHICLE** parked at this location during the day and overnight. As discussed in greater detail below, however, recent wiretap intercepts led investigators to believe that TAYLOR moved the **TARGET VEHICLE** to 65 Saginaw Trail, Shelton, CT, the residence of Jeanne TAYLOR, who is believed to be a relative

of TAYLOR but not his spouse. Investigators first observed the **TARGET VEHICLE** at 65 Saginaw Trail on or about October 12, 2022.

11. As discussed in greater detail below, intercepts and other investigative results to date indicate that TAYLOR currently is using the **TARGET VEHICLE** in furtherance of his drug trafficking activities.

## II.   Use of the TARGET VEHICLE to Conduct Narcotics Trafficking

12. On October 15, 2022, at approximately 4:13PM, TAYLOR received an incoming telephone call from Jeanne TAYLOR. During the communication, TAYLOR and Jeanne TAYLOR discussed the **TARGET VEHICLE**. The following is an excerpt/complete transcription of the communication intercepted over Target Telephone 1 (session 4145):

| | |
|---|---|
| TAYLOR: | Hey what's up? Hello? |
| JEANNE: | You had me with your… messages for.... |
| TAYLOR: | What? |
| JEANNE: | What kind of text messages is that? |
| TAYLOR: | Where are my text messages at? |
| JEANNE: | No, I said why are you texting me fuck you this and fuck you that? I just..I don't want that chuchu in my house. That's all [Voices Overlap] |
| TAYLOR: | I didn't say... I didn't say fuck you this and fuck you that, nothing. |
| JEANNE: | Yes you did. Read it! |
| TAYLOR: | No! I didn't say that. |
| JEANNE: | Read it! |
| TAYLOR: | Ugh no alright. I'll read it. That was it. |
| JEANNE: | Alright I just don't want any... |
| TAYLOR: | Okay. Okay. [pause] Got you. |

| | |
|---|---|
| JEANNE: | So why are you... why are you hanging around a prostitute all this time now for? |
| TAYLOR: | You know I'm not, I'm not willing to do this over the phone. |
| JEANNE: | Why? |
| TAYLOR: | Because I'm not. |
| JEANNE: | I'm not arguing with you I was just curious. |
| TAYLOR: | [Background: Banging noise] Ugh. |
| JEANNE: | Are you still there? |
| TAYLOR: | Yeah I'm still here. |
| JEANNE: | Oh Are you making stuff? |
| TAYLOR: | No I told you I wasn't... I had stuff here already made. |
| JEANNE: | Oh. |
| TAYLOR: | Do you want me to leave some behind? |
| JEANNE: | No, that's alright. |
| TAYLOR: | Alright. Up to you. |
| JEANNE: | Are you still at my house still? |
| TAYLOR: | What's that? Yeah I am, I'm in the trailer. |
| JEANNE: | Oh can you leave a couple then? |
| TAYLOR: | Yes that's what I said I would do. How many.. do you want? |
| JEANNE: | I don't know, 10. [Voices Overlap] |
| TAYLOR: | 50? 10? Alright, alright done. I'm uh... look on that little shelf that's right by the Chimney. |
| JEANNE: | Okay. |
| TAYLOR: | Alright? And that's where I'll leave them. |
| JEANNE: | Okay. |
| TAYLOR: | Alright? Talk to you later. |

| | |
|---|---|
| JEANNE: | Yeah what are you doing in the trailer? |
| TAYLOR: | I'm cleaning up a little bit. [Aside: Grab some [U/I]. Alright] |
| JEANNE: | I thought no one was supposed to know where it's supposed to be at. |
| TAYLOR: | Yeah, I'll like to see this happen. Um... look I'll talk to you in person. Okay? |
| JEANNE: | Alright. |
| TAYLOR: | Alright. I'll talk to you later bye. |

13. Based on my training and experience, and on my knowledge of this investigation, I believe that TAYLOR and Jeanne TAYLOR were discussing TAYLOR's manufacturing of fake pills ("Oh. Are you making stuff"). Jeanne TAYLOR requested that TAYLOR leave some for her ("Oh can you leave me a couple then?"). I further believe that TAYLOR and Jeanne TAYLOR discussed the **TARGET VEHICLE** and the need for the location of the **TARGET VEHICLE** to be maintained a secret, in an effort to protect the **TARGET VEHICLE** (and its contents) from theft ("I thought no one was supposed to know where it's supposed to be at"). During the call, TAYLOR also confirmed that the **TARGET VEHICLE** was parked at Jeanne TAYLOR's house (65 Saginaw Trail), as when Jeanne TAYLOR asked "Are you at my house still?," TAYLOR responded, "Yeah I am, I'm in the trailer." I believe that Willis TAYLOR and Jeanne TAYLOR discussed the contents of the **TARGET VEHICLE** and that TAYLOR was cleaning the trailer after having made drugs ("I'm cleaning up a little bit.").

14. Surveillance conducted via pole camera confirmed that TAYLOR was present at 65 Saginaw Trail during this phone call. At approximately 3:40PM, via pole camera, investigators observed TAYLOR's black 2016 Buick Lacrosse arrive and park in the driveway to the residence located at 65 Saginaw Trail in Shelton, CT. Surveillance, via pole camera, observed TAYLOR, who was accompanied by a female, not Jeanne TAYLOR, walking outside of the vehicle and in

the area of the residence. TAYLOR, along with the unidentified female, entered the residence via the garage, and remained for a period of time. At approximately 3:49PM, via pole camera, investigators observed TAYLOR and the unidentified female exit the residence and then enter the **TARGET VEHICLE**, which was parked in the driveway of 65 Saginaw Trail, where TAYLOR and the unidentified female remained for a period of time. While TAYLOR was within the **TARGET VEHICLE**, law enforcement walked by the trailer and noted that TAYLOR could be heard speaking loudly from within the **TARGET VEHICLE**. TAYLOR's voice was distinct and coming from the **TARGET VEHICLE**, however, what TAYLOR was speaking was unintelligible.

15. On October 19, 2022, at approximately 9:04AM, Willis TAYLOR received an incoming telephone call from Jeanne TAYLOR. During the communication, TAYLOR and Jeanne TAYLOR discussed the **TARGET VEHICLE**. The following is a transcription of the communication intercepted over Target Telephone 1 (session 4399):

[Conversation in Progress]

TAYLOR: What's up? Hello?

JEANNE: Hey, is that stuff still in the back of the garage?

TAYLOR: What do you mean? The...

JEANNE: Bags. [Voices Overlap]

TAYLOR: The bags? The bags?

JEANNE: Yeah.

TAYLOR: Yeah. They're in the... By the thing. Why?

JEANNE: Why don't you put 'em in the trailer?

TAYLOR: Oh, I, I could. I just didn't wanna go out there and make some noise last night.

JEANNE: Oh.

TAYLOR: Right? And I didn't have the thing. I didn't... I wasn't driving the Buick. That's where the uh, thing is.

JEANNE: Oh.

TAYLOR: That's the only reason.

JEANNE: Oh, okay. Is there any way in the next couple days you can come by and put it in the trailer, so it's not in my house? [Voices Overlap]

TAYLOR: Absolutely!

JEANNE: Okay. [Voices Overlap]

TAYLOR: Absolutely. Yes. Without, without a doubt. I would have done it this morning, but it was still a little bit early to be going [Unintelligible Noises]. So... I'll get it, I'll get... Before the... Probably before the day's out. [Pause] Alright?

JEANNE: Yeah.

TAYLOR: Okay.

JEANNE: And no one's coming in here before then.

TAYLOR: No. I'll, I'll get it done today.

JEANNE: Alright. And if someone comes in here and... freaking raids my house. [Snorts]

TAYLOR: Hey JEANNE! Anybody raids your house, it's my stuff, you don't even know what it is!

JEANNE: No, but it's in my house! I'm just saying... I just... [Voices Overlap]

TAYLOR: Yeah.

JEANNE: It's better off in your trailer.

TAYLOR: Okay.

JEANNE: And it doesn't mean that. I mean you can tell Cliff it's there and then show him (Cliff).

[Pause]

TAYLOR: Oh, my God. Yep! All right. [Voices Overlap]

JEANNE: No, don't "Oh, my God!" me. I'm just saying. [Voices Overlap]

10

TAYLOR:   Okay. [Voices Overlap]

JEANNE:   Just put it in the trailer.

TAYLOR:   Okay. [Pause] Okay.

[End of Call]

16.     Based on my training and experience, and on my knowledge of this investigation, I believe that TAYLOR and Jeanne TAYLOR were discussing TAYLOR's having left bags (believed to contain illegal drugs) in the residence of Jeanne TAYLOR ("Hey, is that stuff still in the back of the garage?" "Bags."). Jeanne TAYLOR suggested that TAYLOR move the bags from her house to the **TARGET VEHICLE** ("Why don't you put 'em in the trailer?"). Further, I believe that Jeanne TAYLOR was requesting that TAYLOR remove the bags from her residence due to fears of a "raid" at her residence ("Alright. And if someone comes in here and... freaking raids my house"). Jeanne TAYLOR requested that TAYLOR remove the bags and place the bags in the **TARGET VEHICLE** ("It's better off in your trailer"). I further believe that TAYLOR stated that if the bags (believed to contain drugs) were seized, Jeanne TAYLOR should not accept responsibility for the drugs and instead say that the seized items (which I believe to be drugs) belong to TAYLOR ("…it's my stuff, you don't even know what it is!"). Investigators believe that the bags did in fact contain illegal drugs, based on the content of the communications as well as a motor vehicle stop, during which the referenced bags were seized and found to contain illegal drugs.

**III.    Motor Vehicle Stop of TAYLOR and PAOLELLA in East Haven, CT**

17.     On or about October 20, 2022, law enforcement established a combination of physical and electronic surveillance in the area of 67 Edward Street, West Haven, CT, and in the area of 65 Saginaw Trail, Shelton, CT. At approximately 8:40 AM, surveillance observed TAYLOR arrive at 65 Saginaw Trail in a black Buick sedan bearing CT marker plate AY13862,

11

which is known to be driven by TAYLOR. Surveillance then observed TAYLOR exit the Buick sedan carrying a black duffel bag that appeared to be empty and enter 65 Saginaw Trail.

18. At approximately 9:56 AM, surveillance observed TAYLOR exit the front door of 65 Saginaw Trail carrying two bags in his hands. The first bag appeared to be the same black leather duffel bag that now appeared weighted and full. The second bag was a white "tote" style bag that also appeared weighted and full. TAYLOR carried both bags to the rear of the Buick and loaded them both into the trunk. TAYLOR then entered the driver seat and surveillance observed him depart the area.

19. At approximately 10:06 AM, surveillance was maintained on TAYLOR as he drove through back roads towards Route 15 North. Surveillance followed TAYLOR on Route 15 and onto Interstate 95. Surveillance was maintained as TAYLOR exited I-95 at exit 43 toward West Haven. For a moment, surveillance terminated visual contact with TAYLOR's vehicle as it went down a short one-way road with only one exit. Investigators obtained visual contact with the vehicle several minutes later, and there was now a front seat passenger. TAYLOR was still identified as the operator and the front seat passenger was believed to be Paul PAOLELLA. Wiretap intercepts, surveillance, and other investigative efforts have shown that PAOLELLA is a member of the DTO who purchases narcotics from TAYLOR and redistributes them to his own customer base.

20. Surveillance then followed the Buick to the area of TAYLOR's residence where surveillance was terminated to avoid detection by Willis TAYLOR. TAYLOR's vehicle was then picked up on the pole camera at his residence, 67 Edward Street in West Haven, at approximately 10:30 a.m. The Buick parked on the side of the road in front of the driveway and the white male exited the front passenger seat of the Buick. The identity of this individual was later confirmed

during an East Haven Police Department traffic stop as PAOLELLA. TAYLOR then exited the driver seat and the two individuals walked into the rear door of 67 Edward Street with nothing in their hands.

21. At approximately 10:42 AM, surveillance observed PAOLELLA exit the rear door of 67 Edward Street. At this time, surveillance observed a red and black binder in PAOLELLA's hands. TAYLOR then exited the residence behind PAOLELLA and the two individuals walked to the Buick sedan. It appeared TAYLOR was not carrying anything in his hand, although may have had items on his person. Surveillance observed TAYLOR walk to the Buick and open the trunk. Inside the trunk, surveillance was able to observe the black leather duffel bag and the white "tote" style bag, which appeared to be the same as those removed from 65 Saginaw Trail earlier on this date. TAYLOR was observed opening both bags and may have been secreting narcotics within the trunk that he retrieved from the residence of 67 Edward Street. Surveillance observed PAOLELLA walk to the Buick and place the red binder he carried out of the residence into the rear passenger compartment of the Buick. PAOLELLA and TAYLOR were observed manipulating the front and rear passenger door panels. I believe that during this time, the two were secreting narcotics and contraband that were taken from the residence of 67 Edward Street inside the vehicle. PAOLELLA then entered the driver's seat of the Buick. TAYLOR entered the driver seat of a white BMW 7 series bearing an Arkansas dealer plate, which was parked on the side of Edward Street in front of the residence. At approximately 10:44 AM, TAYLOR and PAOLELLA departed the area in tandem and surveillance followed.

22. At approximately 10:45 AM, surveillance followed TAYLOR and PAOLELLA as they drove in tandem through West Haven and onto I-95 North. Surveillance was maintained as TAYLOR and PAOLELLA drove directly to 376 Quinnipiac Avenue, New Haven, which is an

automotive repair garage. Surveillance observed both vehicles park in the front parking lot at this location.

23. At approximately 10:55 AM, surveillance observed TAYLOR exit the driver seat of the BMW and walk into the front door of the garage with nothing in his hands, while PAOLELLA remained in the Buick for a short period of time. PAOLELLA then exited the Buick and lit and smoked a cigarette while he walked around the parking lot. Minutes later, TAYLOR was observed as he exited through a garage bay door and walked toward PAOLELLA again, with nothing in his hands. TAYLOR and PAOLELLA walked to the Buick sedan where TAYLOR entered the driver seat and PAOLELLA entered the front passenger seat. TAYLOR then drove the Buick through the parking lot of the garage and departed the area. The white BMW was left at the auto garage. During this time, surveillance did not observe any items removed from the Buick. There was also no indication of a hand-to-hand exchange. Therefore, it is believed all items that were placed into the Buick from the aforementioned locations were still present inside of the vehicle when TAYLOR and PAOLELLA left Quinnipiac Avenue.

24. Surveillance was maintained on the Buick as it drove on Quinnipiac Avenue toward East Haven/Route 80, onto Route 80, and then onto Foxon Hill Road. The Buick arrived in the driveway of 46 Foxon Hill Road at approximately 11:09 AM. DTO member and coconspirator Thomas JOSLIN, who has been intercepted on the wiretap discussing purchasing narcotics from TAYLOR, is known to reside at this address. Surveillance teams were unable to maintain visual contact on TAYLOR while he was at this address due to it being a residential neighborhood. At approximately 11:18 AM, surveillance observed the Buick depart 46 Foxon Hill Road and travel toward Route 80. At that time, investigators coordinated with the East Haven Police Department to conduct a motor vehicle stop of the Buick sedan.

25. At approximately 11:20 AM, a marked East Haven Police Department patrol vehicle conducted a motor vehicle stop of the Buick for a traffic violation in front of 704 Foxon Road, East Haven. TAYLOR and PAOLELLA were the occupants of the Buick, with TAYLOR driving and PAOLELLA in the front passenger seat. Officer Palma responded to the scene of the traffic stop. Officer Palma is a trained K9 handler and he works with his K9 partner "Enzo." Officer Palma's K9 is trained in the detection of narcotics. Officer Palma walked his K9 partner around TAYLOR's Buick sedan where it positively alerted to the presence of narcotics.

26. A search of the Buick resulted in the discovery of a red and black binder containing what I believe, based on my training and experience, is a drug ledger. The red and black binder is the same binder that surveillance observed PAOLELLA remove from 67 Edward Street and place into the Buick sedan. Later review of this drug ledger indicated that TAYLOR is likely in custody of three pill presses, to include one TDP-1 model and two TDP-5 model pill presses.[2] The ledger also included references to drug debts owed by various criminal associates of the DTO.

27. A search of the trunk compartment of the Buick resulted in the discovery of a black leather duffel bag and a white "tote" style bag, matching the bags that surveillance observed TAYLOR remove from 65 Saginaw Trail and place into the Buick sedan. The duffel bag was found to contain quantities of cocaine and the tote bag was also found to contain quantities of narcotics. Also located in the passenger compartment was a black zippered container, containing quantities of orange tablets and blue tablets, of suspected controlled substances. Investigators believe these tablets were what TAYLOR and PAOLELLA retrieved from 67 Edward Street and secreted inside the Buick. The pills and narcotics found in the trunk of the Buick were field tested and indicated presumptive positive results for methamphetamines, amphetamines, cocaine, and

---

[2] "TDP-1" refers to a specific model of automated pill press that delivers one tone of force when it produces a tablet, while "TDP-5" refers to a model that delivers five tons of force.

fentanyl, among other narcotics. TAYLOR was arrested on state charges relating to his possession of these narcotics. A photograph of some of the items seized from the Buick is below.



28. Based on the recovery of substantial amounts of narcotics that were traced to the Buick from 65 Saginaw Trail, I believe the 65 Saginaw Trail address is a location used by TAYLOR to store and manufacture narcotics and controlled substances. This belief is supported by the observations of physical and electronic surveillance as well as the motor vehicle stop conducted by the East Haven Police Department.

29. Further, I believe that 65 Saginaw Trail, and specifically the **TARGET VEHICLE**, is a location used by TAYLOR to manufacture controlled substances based on my examination of the tablets seized during the motor vehicle stop. I observed the seized tablets to be inconsistent in color and shape, and of poor general quality. Based on my training and experience I believe the tablets were consistent with tablets manufactured through illegitimate means utilizing a tableting machine (Pill Press). The orange tablets in particular resemble pills seized during a walled-off

stop on or about July 5, 2022, of a customer of TAYLOR's following a suspected narcotics transaction between TAYLOR and the customer.

30. I further believe that due to the fact that the black duffel bag and the white tote-style bag were retrieved from 65 Saginaw Trail, and based on the intercepted phone calls described above, the tableting machine is also located at the address. This belief is supported by my training and experience that drug traffickers involved in the manufacture of counterfeit tablets maintain a location to be utilized as a clandestine laboratory. The tableting machine and the mixing equipment is typically bulky and heavy machinery that is not readily mobile. Therefore, the stash location and the manufacturing location are commonly in close proximity to one another.

### IV. Difficulty Maintaining Surveillance of the TARGET VEHICLE.

31. Based on my involvement in this investigation and my personal participation in surveillance, I know that the **TARGET VEHICLE** is typically located within this District and is currently parked at 65 Saginaw Trail in Shelton. However, a tracking device is necessary because the **TARGET VEHICLE** is currently parked in a residential area, and therefore conducting surveillance of the **TARGET VEHICLE** has proven difficult. Additionally, I believe TAYLOR has often conducted work at all hours of the day and night in an effort to avoid law enforcement detection.

32. Moreover, in light of the East Haven traffic stop and TAYLOR's recent arrest, Jeanne TAYLOR or one of TAYLOR's coconspirators may seek to move the **TARGET VEHICLE** or conceal or destroy any evidence in the **TARGET VEHICLE**. Investigators know that members of the DTO, including TAYLOR, have multiple vehicles which may be used to move the TARGET VEHICLE at any given time. Investigators further note that investigators did not know the location of the TARGET VEHICLE for an extended period of time, and that the **TARGET VEHICLE** has been moved to various locations during the course of the investigation.

The requested tracking device will allow law enforcement to monitor if the **TARGET VEHICLE** is moved to another location and will help law enforcement determine if and when additional investigative action is required.

33. In conclusion, this investigation has revealed that TAYLOR utilizes the **TARGET VEHICLE** to facilitate his illegal activities, to include the manufacture and storage of narcotics. The GPS tracking of the **TARGET VEHICLE** will allow agents to identify manufacturing and storage locations (in proximity to the **TARGET VEHICLE**). The GPS monitoring of the **TARGET VEHICLE** will assist case agents with tracking TAYLOR's location, which will in turn aid in identifying coconspirators and significant locations where TAYLOR may conduct illegal activities such as the TARGET OFFENSES.

## REQUEST FOR AUTHORIZATION

34. Based on the information presented above, I know that the **TARGET VEHICLE** is presently within the District of Connecticut. In order to track the movement of the **TARGET VEHICLE** effectively and to decrease the chance of detection, I seek to place a tracking device in or on the **TARGET VEHICLE** while it is in the District of Connecticut. The information obtained from the GPS device will facilitate physical surveillance of the **TARGET VEHICLE**, its operators, and its occupants, and it will constitute or lead to evidence of the offenses under investigation because it will assist investigators in ascertaining, inter alia, the locations where TAYLOR and his associates obtain narcotics, store narcotics, sell narcotics, and store proceeds from the sale of narcotics. As indicated in the search warrant application, I am requesting authorization to enter the private property on which the **TARGET VEHICLE** is parked, which is currently 65 Saginaw Trail, Shelton, CT, for purposes of installing the tracking device.

35. To ensure the safety of the executing officers and to avoid premature disclosure of the investigation, it is requested that the Court authorize installation and removal of the tracking

device during both daytime and nighttime hours. Given the evidence that TAYLOR and his associates are involved in distributing narcotics, investigators will seek times and places to effect the installation, repair, replacement, and removal of the tracking device that will best ensure the safety of investigators and best ensure the integrity and secrecy of this investigation.

36. In the event the Court grants this application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period of 45 days following installation of the device. The tracking device may produce signals from inside private garages and other locations not open to the public or visual surveillance.

## CONCLUSION

37. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes members of the DEA or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device in or on the **TARGET VEHICLE** within the District of Connecticut within 10 days of the issuance of the proposed warrant; to maintain, repair, and/or replace the tracking device as necessary; to remove the tracking device from the **TARGET VEHICLE** after the use of the tracking device has ended; to install, maintain, and remove the tracking device during both daytime and nighttime hours; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the District of Connecticut.

38. In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I request that the warrant delay notification of the execution of the warrant for a period of 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an

adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

39.     WHEREFORE, your affiant respectfully requests that the Court issue a warrant authorizing members of the DEA or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above described investigation, to install a tracking device in or on the **TARGET VEHICLE** while it is within the District of Connecticut, regardless of whether the **TARGET VEHICLE** is located on public or private property, within 10 calendar days of issuance of the requested warrant; to remove said tracking device from the **TARGET VEHICLE** after the use of the tracking device has ended; to surreptitiously enter the **TARGET VEHICLE** and/or remove the **TARGET VEHICLE** to effect the installation, repair, replacement, and removal of the tracking device; and to monitor the tracking device for a period of 45 days.

Respectfully submitted,

DAVID SCHAEFER (Affiliate)
Digitally signed by DAVID SCHAEFER (Affiliate)
Date: 2022.10.22 08:29:27 -04'00'

David C. Schaefer
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to by telephone on October 22,, 2022, in New Haven, Connecticut.

Maria E. Garcia
Digitally signed by Maria E. Garcia
Date: 2022.10.22 09:35:40 -04'00'

HON. MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE